144 So. 13

### MANN et al. v. RUDDER et al.

8 Div. 416.

Supreme Court of Alabama.

Oct. 6, 1932.

Rehearing Denied Nov. 10, 1932.

Proctor & Snodgrass, of Scottsboro, John A. Lusk, of Guntersville, and Ball & Ball, of Montgomery, amicus curiæ, for appellants.

D. P. Wimberly, of Scottsboro, and Haralson & Son, of Ft. Payne, for appellees.

GARDNER, J.

The will of J. F. Washington, deceased, was duly probated following a contest (Johnson v. Johnson, 206 Ala. 523, 91 So. 260), and the present appeal is by the executors of his estate from a decree rendered on final settlement thereof.

Testator left to the appellees his entire estate, with the provision that the same should be kept together and the money "loaned out at a legal rate of interest with perfect real estate security," until the youngest child should become of age or marry. This youngest child, referred to in the record as Sallie Washington, reached her majority in December, 1929, and for several years prior thereto the executors had kept together the estate, consisting largely of cash funds or liquid assets, and made numerous loans as directed in the will. Among these loans was one of $100,-000 to J. F. Mitchell, who operated a lumber plant at Stevenson, Ala. This loan was made in May, 1927. The legatees had no knowledge of the loan at the time. True, the attorney of the adult legatee, Mrs. Rudder, prepared the mortgage and examined the title at the instance of the executors, for the services of which the borrower paid, but it is without dispute that he in no manner approved the security. To the contrary, he cautioned the executors against so large a loan on such security. The borrower was largely indebted ($34,000) to the bank at Stevenson, of which one of the executors was manager, and to another bank or banker in the same community in the sum of $10,000 as well as considerable indebtedness to banks outside the state. He was reputed, however, to be a good moral risk and a man of considerable worth. All of which may be properly considered in making a loan, but the basic foundation for the loan, to follow the directions of the will, was "perfect real estate security," and the matter of improvidence of a transaction of such magnitude must at last principally rest upon the nature of the security given, which consisted of a mortgage on ten thousand acres (not, however, all in one body) of mountain timber land, the larger part of which was located in Jackson county, Ala., with some of it across the line in Tennessee. The executors offered much proof tending to show this timber land was worth $200,000, and ample security for the loan, while the evidence offered by the legatees was to the contrary, all of which, of course, was based upon the estimate and opinion of the witnesses testifying for the respective parties.

■ Counsel for the executors note the rule and cite the authorities to the effect that a trustee in making investments is not an insurer as to the results, but that all that can be exacted of him is diligence and fidelity in the discharge of his duties—the exercise of that prudence and care in the management of the trust which men of ordinary prudence exercise in like business of their own. This is the recognized rule. "Infallibility is not exacted of trustees. They must form their best judgment in the light of existent facts, and, if they act in good faith, are not responsible for results which ordinary vigilance and prudence could not foresee." Lyon v. Foscue, 60 Ala. 468; Foscue v. Lyon, 55 Ala. 440.

But other considerations, now to be stated, enter into the case which render unnecessary a determination as to whether or not the loan was improvident within the above-noted rule, and unjustified under the will's directions. No detailed discussion of the evidence, so vigorously argued by counsel, is here deemed necessary. Suffice it to say the conflicting proof discloses the above question as one of serious controversial character. As previously stated, the legatees had no knowledge at the time of the loan, and one of the executors appears to have suggested silence on the part of Mrs. Rudder's counsel, stating, however, it was because the borrower did not want others

to know he was negotiating for such a loan. The legatees appear to have objected to the loan from their first information concerning it, and at the partial settlement in the following December, 1927, the guardian ad litem for the minor and the attorney for Mrs. Rudder interposed oral objections thereto in open court, and the judge of probate stated in his letter to the surety company on the bond of the executors that it was understood the matter of their objections would arise on final settlement of the estate. The legatees continued their protests, and, it appears, also contemplated interposing objections to other loans and to surcharge the account as allowances and commissions previously paid the executors. And in February, 1928, the attorney for Mrs. Rudder wrote the executors that his client would not accede to the Mitchell loan, and that they "make arrangements to treat this loan as cash upon final settlement," otherwise she would "file suit for devastavit unless it is converted into cash." This same attorney in August, 1929, wrote again to the executors that the legatees did not consider the loan properly secured and their intention to have the amount thereof charged to said executors on final settlement. In order, however, to avoid litigation, the letter proposed to accept the principal sum of $100,000, with interest thereon at 4¼ per cent. from June 1, 1927, until said sum is paid over to the legatees and with other provisions, details of which are not necessary here to note. In the meantime, Mitchell had been making payment of the principal and interest notes as they fell due, and thus reducing the indebtedness to that extent. Negotiations for a compromise agreement continued. The executors found a way, as they thought, to procure the cash on their loan by refinancing the same with Tigrett & Co. of Memphis in a bond issue. Mitchell desired $15,000 more, and the proposition of the legatees for a much smaller rate of interest amounted to a discount of some eight or nine thousand dollars. The arrangement for the refinancing of the loan culminated in a trust deed by the Mitchell Manufacturing Company, a corporation, to which J. F. Mitchell had executed a deed to the property, including the lumber plant not covered by the first mortgage, in the sum of $115,000. To this end the executors satisfied of record the Mitchell mortgage and surrendered the same. Many of the bonds were sold.

Executor Mann signed a memorandum agreement as to the understanding reached between the parties, and handed it to the husband of Mrs. Rudder. This memorandum appears as Exhibit 18 to Mann's testimony, and as Exhibit 16 to the testimony of this witness, and is a statement prepared by Mann showing the balance due the legatees on account of the Mitchell loan "figured on basis of settlement as agreed upon by attorneys for Luella Rudder and Sally Washington," to be the sum of $50,788.31.

The understanding and agreement between the parties to this litigation reached a climax in three separate writings signed by the attorneys for the executors and those representing the legatees, the first of which are made exhibits to Mann's testimony, and appear, together with the exhibits named above, in the report of the case. These agreements are signed by counsel only, and not by the parties themselves, and it is insisted by appellants the attorneys had no power to bind their clients in this regard, and the agreements are for that reason ineffective, citing (among other authorities) Senn v. Joseph, 106 Ala. 454, 17 So. 543; Barton v. Burton Mfg. Co., 202 Ala. 180, 79 So. 664; Ex parte Hayes, 92 Ala. 120, 9 So. 156; 6 Corpus Juris 646—while appellees insist that section 6253, Code 1923, suffices for this purpose. But we need not stop to consider and determine this question, for the reason that under the undisputed proof the executors were present when the agreements were dictated and written, read the same, and saw their counsel execute them. There could be, under the proof, only one conclusion to be drawn, to the effect that the attorneys were acting under the express authority of the executors with their full knowledge and acquiescence. The binding effect, therefore, of these agreements is not to be avoided upon any lack of authority in their execution. The executors further urge that the agreements were only intended as a continuance of the date of final settlement and authority to them to discount the Mitchell mortgage which they were not authorized to do without the consent of the legatees.

We cannot find in the language of these writings authority for so limited an interpretation, but, on the contrary, it is expressly stated that the executors are to settle the Mitchell loan by the payment of the amount thereof on final settlement with interest, first at 4¼ per cent. and in the last writing at 6 per cent. from June 1, 1930, until final settlement in December, 1930, and the balance due is named pursuant to the statement prepared by Mann and made Exhibit 16 to his testimony. These three writings, construed together and in the light of the previous negotiations between the parties, clearly disclose they are the result of a compromise agreement over the controverted issue of the Mitchell loan, with concessions on the part of the legatees as to the interest thereon and a withdrawal on their part of any contemplated objections to other loans, allowances, or interest charge for money on deposit, all of which constituted ample consideration therefor, and that upon final settlement only the question of attorneys' fees and commissions to be allowed the executors will be left open for determination.

It is suggested by appellants' counsel that these agreements, not having been signed by the executors or any one so authorized by them in writing, were void as violative of the statute of frauds (subdivision 2 of section 8034, Code 1923), which renders void every special promise by an executor or administrator to answer damages out of his own estate, unless so executed. Sharman v. Jackson, 47 Ala. 329; Davidson v. Rothchild, 49 Ala. 104. But these agreements do not constitute any special promise by the executors to answer damages out of their own estate. They are properly to be construed as conceding the question of improvident investment and an agreement on their part to account to the estate for the original sum—a mere refund to the estate of funds belonging thereto. The statute of frauds is without application. 27 C. J. 128.

It is evident the executors anticipated all the bonds would be readily disposed of and that Tigrett & Co. would be able to complete the transaction. But the financial depression came into full sway before all the bonds could be disposed of, and it is clear "there's the rub." The remaining bonds are offered by the executors to the legatees, and they refuse to accept them, for this was not the understanding. The plain meaning of the written agreements was that the executors were to account for the original sum, and their language is not susceptible of any other rational interpretation. Nor does it matter there has been shown no actual loss, as argued by appellants, citing 27 Cyc. 417. The legatees had no part in the original loan nor were they participants in any scheme of refinancing the same. All of this was done by the executors and upon their sole responsibility. They have agreed to account on final settlement for the amount of the loan, and all questions of good faith, diligence, and loss were foreclosed by such agreement. Upon their own responsibility, and without any consultation with these legatees, the executors satisfied on record the original mortgage, and delivered the same to Mitchell, the borrower—all of which was in furtherance of their effort to refinance the loan and in anticipation that the plans thus outlined would be carried out to a successful conclusion.

Nor are we impressed with the argument that the legatees have been guilty of any conduct out of which could arise a basis for the application of the theory of equitable estoppel, in support of which many authorities are cited, among them, Steinhart v. Gregory, 176 Ala. 368, 58 So. 266; Wilson v. Stevens, 129 Ala. 630, 29 So. 678, 87 Am. St. Rep. 86; Chandler v. Chandler, 87 Ala. 300, 6 So. 153; Meyers v. Martinez, 172 Ala. 641, 55 So. 498; Marx v. Clisby, 130 Ala. 502, 30 So. 517; 28 Corpus Juris 1159. True, upon partial settlement the executors accounted for some of the money Mitchell had paid in meeting the first principal and interest notes as they fell due, but the legatees let it be distinctly understood in open court they were objecting to the Mitchell loan and expected the executors to account for the original sum. Their conduct certainly misled no one, and the mere fact of such accounting for funds which in fact belonged to them could form no basis for an estoppel. And the accounting for the proceeds of the bonds that were sold stands on no better grounds. The legatees passed over the final settlement from time to time that the executors could procure the funds and account for the original sum pursuant to their express agreement.

The situation called for no election. The matter had been agreed upon and a large portion of the funds procured, but from what source was no concern of the legatees, and of the sums so paid the legatees due credit is given the executors. But we find nothing in their conduct that would justify any conclusion they had waived their right to the balance of the fund, merely because they had been paid a part, or that they must accept bonds for the balance in lieu of cash as the agreements provided. The proof discloses no foundation for the application of the theory of equitable estoppel. But we consider further discussion unnecessary. The evidence has been given careful consideration, and we are fully mindful that, should the security held by the executors prove insufficient, there will doubtless result a personal loss as well as resultant loss to the surety on their bond. But the executors have entered into a binding agreement to account for the original loan, and no reason appears for a repudiation thereof. The language is plain and unmistakable, and the agreements were executed with their full knowledge and acquiescence. The unfortunate result to the executors may be attributed to the financial depression, but, whatever the cause, these legatees are under no obligation to accept other than stipulated in the written agreement. Before making the loan, the executors were warned by the attorney for Mrs. Rudder that the security was doubtful, and objection was made thereto by the legatees upon their first information concerning it. They have been misled by no conduct of the appellees, and the responsibility for the loan as well as their subsequent agreements in relation thereto rests upon them alone. The decree but gave effect to these agreements, and we conclude the objections thereto are not well taken.

In the decree rendered, the executors have been allowed the maximum percentage of commission, and also allowance made for extraordinary services in relation to the administration of the estate. The chancellor increased the fees for the attorneys for the executors from that allowed in the register's report. Upon both of these matters the evidence was in sharp conflict, all of which has

been carefully considered. We do not consider that a discussion of it here would serve any useful purpose. Suffice it to say that as to these matters much is left to the sound judicial discretion of the court on final settlement (Boyte v. Perkins, 211 Ala. 130, 99 So. 652; Collins v. Clements, 199 Ala. 618, 75 So. 165; Rice v. First National Bank, 212 Ala. 352, 102 So. 700), and from our study of the record we are not persuaded the action of the court in this respect should be here disturbed.

It results that we find no error to reverse, and the decree will accordingly be affirmed.

Affirmed.

ANDERSON, C. J., and FOSTER and KNIGHT, JJ., concur.